**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **ESSEX HAYWARD et al.,** ) | Case No. 1:12 CV 2 |
| ) | |
| Plaintiffs, ) | Judge Dan Aaron Polster |
| ) | |
| vs. ) | **OPINION AND ORDER** |
| ) | |
| **CLEVELAND CLINIC FOUNDATION** ) | |
| **et al.** ) | |
| ) | |
| Defendants. ) | |

This is a civil-rights case arising out of an incident that took place in the early-morning hours of January 23, 2011, between Cleveland Clinic police officers, Aaron Hayward, and his parents, Essex and Annie, at their home on East 106th Street in Cleveland, Ohio. Now before the Court is a motion for partial judgment on the pleadings (**Doc. # 34**) filed on behalf of all Defendants.[1] Defendants seek judgment in their favor on Annie and Essex Hayward's battery, assault, and § 1983 claims; on the intentional-infliction-of-emotional-distress claim asserted by all three Plaintiffs; and on the supervisory liability and Monell claims asserted against the Cleveland Clinic Foundation, the Cleveland Clinic Police Department, Dr. Cosgrove, former Chief Kalavsky, Chief Easthon, and Corporal Bailey.

I. Facts

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true...." JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 581 (6th Cir. 2007) (internal quotation marks and citation

---

[1]Defendants include: the Cleveland Clinic Foundation; the Cleveland Clinic Police Department; Delos Cosgrove, CEO of Cleveland Clinic Foundation; John L. Kalavsky, former Police Chief and Current Director of Healthy System Security; David Easthon, Police Chief; Officer Richard Howard; Officer Adam Cronig; Officer Nicholas Foglyano; Officer Eric Parks; Officer Kevin Payne; Officer Gary Ribbich; and Corporal Keith Bailey.

omitted).  Accordingly, what follow are the facts as pleaded in Plaintiffs' Second Amended Complaint (Doc. # 30).

Plaintiff Aaron Hayward was driving home from work shortly after 4 a.m. on January 23, 2011, when a Cleveland Clinic Police Department officer pulled up behind him at an intersection.  The officer followed Aaron the few remaining blocks to his home on East 106th Street, where he lived with his elderly parents, Annie and Essex.  When Aaron arrived at home he parked his car and started heading inside.  The officer pulled his car into the driveway, got out, and yelled for Aaron to come over; the officer intended to cite him for driving erratically.

Aaron rebuffed the officer, walked into the house, and locked the door behind him.  The officer called for backup.  Several officers arrived, and together they pounded on the side door.  The noise woke Aaron's parents, aged 79 and 85, who were asleep upstairs.  Essex, Aaron's father, ran down to investigate and saw blue and red flashing lights and several uniformed men standing outside.  The officers yelled, "Open the fucking door!"  Essex opened the wooden interior door—a metal security door still separated him and the officers—and asked the men what they wanted.  "Open the fucking door!" they repeated.  Essex refused and said he was going to call the Cleveland Police.

The men in uniform were on-duty Cleveland Clinic police officers.  Although the Cleveland Clinic is a private, non-profit hospital, the Clinic operates its own police department pursuant to Ohio Revised Code § 4973.17 and a written agreement between the Cleveland Clinic Foundation and the City of Cleveland.  Thus, even though the Clinic is a private concern, their police officers are effectively state actors.

These officers forced their way inside the Haywards' home.  Using their standard-issue batons, they broke the glass on the outer steel door and reached in to unlock it.  With the butt of a shotgun, one officer knocked out the Plexiglass window of the second, wooden door.  Aaron braced himself against the inside door to prevent the officers from pushing it open.  The officers, as they continued to force their way in, uttered threats and called Aaron a "black nigger."  Annie

and Essex watched the events unfold, terrified.

Through the opening in the doors, an officer shot his Taser, which hit Aaron in the chest. Aaron removed the probes, but another officer struck Aaron a second time with the Taser. Aaron gave up, the officers entered the home, and Aaron surrendered to them.

Despite the fact that Aaron stopped resisting, the officers continued to attack him, both physically and verbally.  They pulled him from the house, brought him out to the driveway, forced him down to the ground, and handcuffed him.  The officers punched and kicked him in the head and body, hurled racial epithets at him, beat him with their batons, and stunned him with Tasers.  Aaron suffered facial abrasions that have left permanent marks on his face.  The officers took Aaron to the Cleveland Clinic's Emergency Room and then to the Cuyahoga County Jail.

At some point after Aaron's arrest, the officers turned to Annie and Essex and commanded them to produce their I.D.s.  If they refused, the officer warned, he would punch them in the mouth.  The officer ordered them to stay inside the home or risk being arrested.  To Annie and Essex, the officers' actions reminded them of their childhood in the segregated "Old South," where lynch mobs and violence against blacks were accepted parts of life.  Annie and Essex claim to have suffered profound psychological harm, including humiliation and embarrassment, as a result of the ordeal.  Essex was even hospitalized shortly after the incident. Both Annie and Essex continue to see a psychologist.

Following this incident, Aaron was indicted in state court on ten counts: failure to comply; aggravated menacing; three counts of assault; felonious assault; obstructing official business; and three counts of a resisting arrest.  (Doc. # 33-1).  On June 16, 2011, Aaron pled guilty to two counts: failure to comply and resisting arrest.  (Doc. # 33-2).  He was sentenced to a fine of $200 with no term of incarceration.  (Id.).  The remaining counts were nolled.  (Id.).

On January 3, 2012, Aaron and his parents commenced the instant civil lawsuit.  In their Second Amended Complaint they allege the officers used excessive force in violation of the

Fourth and Fourteenth Amendment.² They also assert claims under 42 U.S.C. § 1983 against the CCF and the CCPD and the officers' supervisors, Easthon, Kalavsky, Bailey, and Cosgrove. Finally, Plaintiffs assert state-law claims of battery, assault, and intentional infliction of emotional distress. Defendants now seek judgment in their favor on most of these claims: the claims against the CCF, the CCPD, and the supervisors; the parents' claims against the individual officers; and Aaron's intentional-infliction-of-emotional-distress claim against the officers.

II. Analysis

The same standard for deciding a Rule 12(b)(6) motion to dismiss applies to a Rule 12(c) motion for judgment on the pleadings. Roth v. Guzman, 650 F.3d 603, 605 (6th Cir. 2011). A 12(b)(6) motion tests the sufficiency of the complaint. To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A. Annie and Essex's Battery Claim

In order to adequately plead a claim of battery under Ohio law, a plaintiff must allege an intentional harmful or offensive touching. Northern v. Med. Mut. Of Ohio, 2006-Ohio-1075, at ¶ 10. See also Anderson v. St. Francis-St. George Hosp., 77 Ohio St. 3d 82, 84 (1996) (battery requires a touching). But Essex and Annie Hayward do not allege the officers touched them, so

---

²The excessive-force claim pertains to the actions of the police officers *after* Aaron had stopped resisting arrest. As the Court explained in a previous order (Doc. # 29), because Aaron pled guilty to resisting arrest in violation of Ohio law (O.R.C. § 2921.33), neither he nor his parents may assert an excessive-force claim based on police conduct *prior to* the point in time when the defendant had been arrested and subdued—that is, stopped resisting. See Heck v. Humphrey, 512 U.S. 477 (1994); Swiecicki v. Delgado, 463 F.3d 489 (6th Cir. 2006); Michaels v. City of Vermillion, 539 F. Supp. 2d 975 (N.D. Ohio 2008).

their battery claim fails.

B. Annie and Essex's Assault Claim

Assault is the "willful threat to harm or touch another offensively" that reasonably places the other in fear of such contact. Knox v. Hetrick, 2009-Ohio-1359, at ¶ 49 (internal citations and quotations omitted). The threat "must be coupled with a definitive act by one who has the apparent ability to do the harm or to commit the offensive touching." Id.

Plaintiffs argue that one of the officers committed assault against the parents when he threatened to punch them in the mouth if they refused to comply with his order to produce their I.D.s. (Doc. # 44 at 17). Plaintiffs argue that the officers made committed definitive acts when they broke through two doors to enter the home, used batons and a shotgun to break the glass on the outer security door, and Tased their son. (Id.).

But, as Plaintiffs themselves acknowledge, to adequately plead an assault claim a plaintiff must allege a definitive act as a "physical gesture toward [the plaintiff] indicating an offensive touching was imminent.'" Coyle v. Stebelton, No. 00CA74, 2001 WL 704462, at * 3 (Ohio App. Jun. 15, 2001). The complaint does not allege any physical gesture *toward* Annie or Essex Hayward indicating that an offensive touching was imminent. Accordingly, the parents' assault claim fails.

C. Annie, Essex, and Aaron's Claim of Intentional Infliction of Emotional Distress

A person is liable for intentional infliction of emotional distress ("IIED") if he "by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another." Yeager v. Local Union 20, Teamsters, 6 Ohio St. 3d 369, 374 (1983) (quoting RESTATEMENT (SECOND) OF TORTS § 46(1)) (1965). Liability for this tort will be found only in the most extreme circumstances: "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Yeager, 6 Ohio St. 3d at 375 (quoting RESTATEMENT § 46 cmt. d). Liability "does not extend to mere insults, indignities,

threats, annoyances, petty oppressions, or other trivialities." Yeager, 6 Ohio St. 3d at 375 (quoting RESTATEMENT § 46 cmt. d).

According to Plaintiffs, the gravamen of their claim is the supposedly egregious manner in which the officers entered their home: "Defendant Officers['] violent and brutal invasion of the Haywards' home without justification." (Doc. #44 at 19). As the Court explained in a previous order (Doc. # 29), however, Aaron's guilty plea for resisting arrest constitutes an admission that the arrest was conducted in a lawful and reasonable manner, as this is an element of the crime of resisting arrest under Ohio law. By contrast, liability for IIED will be found only where the defendant's conduct was both extreme and outrageous conduct. RESTATEMENT § 46 cmt. d. It is not enough that the conduct was tortious or even criminal. Id. As a logical matter, if an act is reasonable (*i.e.*, neither tortious nor criminal), it cannot qualify as extreme and outrageous. Thus, if Aaron's parents were permitted to maintain an IIED claim based on the manner of the arrest, that would imply the invalidity of Aaron's guilty plea for resisting arrest, for it would imply that the arrest was unreasonable. That is forbidden under Heck v. Humphrey, 512 U.S. 477 (1994). See Swiecicki v. Delgado, 463 F.3d 489 (6th Cir. 2006); Michaels v. City of Vermillion, 539 F. Supp. 2d 975 (N.D. Ohio 2008). For this reason, Aaron's parents may not rely on any aspect of the arrest (be it the smashing of glass or the Tasing of their son) for their IIED claim.

As to the officer's threat to the parents, even assuming the words were uttered, they fall into the same category as those words for which liability will not lie: insults, indignities, and threats. Annie and Essex's IIED claim therefore fails.

Aaron Hayward's IIED claim also fails. Apart from the officers' pre-arrest conduct, which, of course, may not form the basis of Aaron's IIED claim, the only conduct on which Aaron is left to rely is the officers' post-arrest actions. As alleged in the complaint, following Aaron's arrest, the officers pulled him from the house, brought him to the driveway, forced him down to the ground, and put handcuffs on him. The officers then punched and kicked him in the

-6-

head and body, hurled racial epithets at him, beat him with their batons, and stunned him with Tasers. But those actions, unreasonable though they may be, are no more egregious than the defendant-officers' conduct in the following cases in which the plaintiffs lost, as a matter of law, on their IIED claims.

In Gill v. Kovach, 729 F. Supp. 2d 925, 941 (N.D. Ohio 2010), Judge Nugent held that the conduct of police officers, who "used excessive force by repeatedly using a taser to obtain control over" the plaintiff, was not beyond all possible bounds of decency. In Martin v. City of Broadview Heights, No. 1:08 CV 2165, 2011 WL 3648103, at * 1–2 (N.D. Ohio Aug. 18, 2011), a police officer sat on top of the plaintiff with knees dug into his back, hit him in the side with compliance shots, punched him in the face twice, wrapped his arm around his chin, and pressed him face-down until he made a gurgling noise. The plaintiff became unresponsive and died from asphyxiation. Id. at * 2. Even all this, Judge Oliver determined, did not constitute extreme and outrageous conduct. Id. at * 17. Judge Oliver observed that "[w]hile Defendant Officers conduct may constitute excessive force, a battery, and assault, and thus was unreasonable and even reckless, their restraint of the decedent was not so "utterly intolerable in a civilized community." Id. Consistent with these two cases, the Court finds that Aaron Hayward's facts are insufficient to sustain a claim of IIED.

D. Annie and Essex's § 1983 Claim Against the Individual Officers

Annie and Essex also make a Fourth Amendment claim of unreasonable seizure. In order "to assert a successful Fourth Amendment claim, the plaintiff must first show that there was a seizure." Ewolski v. City of Brunswick, 287 F.3d 492, 506 (6th Cir. 2002). "A Fourth Amendment seizure occurs when a police officer restrains the liberty of a citizen in such a way that a reasonable citizen would reasonably believe under the circumstances that he or she was not free to leave." Id. (citing Michigan v. Chestrnut, 486 U.S. 567, 573 (1988)). There is no seizure without actual submission. Brendlin v. California, 551 U.S. 249, 254 (2007).

Defendants make two arguments to defeat the Fourth Amendment claim. First they argue

there was no seizure because Annie and Essex did not actually submit to the officers' show of authority. But the complaint shows otherwise. When the officers entered the house, Annie and Essex stayed put. They did not flee—or try to flee—either their home or the area of the house where the scuffle took place. To be sure, Annie and Essex refused to show the officers their identifications (which, according to Plaintiffs, is what prompted one of the officers to threaten to punch them in the mouth). But the touchstone of a seizure is whether the person was successfully *detained*, Ewolski, 287 F.3d at 506, that is, physically restrained or confined to a place, not whether the person was compliant or submissive in every way possible. By that standard, Annie and Essex submitted to the officers' authority.

Defendants' second argument is that the force used to seize Annie and Essex was reasonable. Whether a seizure is reasonable depends on the totality of the circumstances: "The determination of whether force used to effect a seizure was unreasonable 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. at 507–08 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

Plaintiffs are, once again, misguided in their focus on the manner in which the officers entered the home. In light of Aaron's conviction, the entry into the home cannot form the basis of his parents' claim; rather, the question is limited to whether the officers used unreasonable force when they threatened to punch Annie and Essex in the mouth and threatened to take them to jail if they refused to comply. Given that such actions do not fail to state a claim for either assault or IIED, it seems unlikely they would constitute an excessive use of force. Indeed the case law confirms this intuition.

The courts have upheld as reasonable the temporary detention of innocent bystanders where necessary to secure a valid arrest and ensure officer safety. Bletz v. Gribble, 641 F.3d 743, 755 (6th Cir. 2011). In Thornton v. Fray, 429 F. App'x 504, 507 (6th Cir. 2011), police officers

put innocent occupants in handcuffs for two hours while conducting a search of the house. Moreover, before handcuffing the occupants, the officers drew and pointed their weapons and even pushed a female occupant to the floor, though the woman was not in any way resisting. Id. at 508–10. Yet the Sixth Circuit found these actions to be reasonable given the compelling need to secure the scene and make an arrest. Id. at 509. Furthermore, in Duran v. Sirgedas, 240 F. App'x 104, 111 (7th Cir. 2007), the Seventh Circuit determined that it was "eminently reasonable" for the officers to order partygoers into a house by saying, among other things, "get the f--- inside."

Plaintiffs make no attempt to distinguish these latter two cases. In fact, they do not even address them. In any event, the Court is persuaded that if it is reasonable for an officer who is effectuating a valid arrest to curse at innocent bystanders, point a gun at them, throw them to the ground, and handcuff them for hours, then it is also reasonable (albeit disrespectful) to threaten to punch them in the mouth and order them in a stern and forceful voice to produce their I.D.s. The Court finds Annie and Essex have failed to state a claim for unreasonable seizure.

E. Annie and Essex's Monell and Supervisory Liability Claim

Annie and Essex assert supervisory liability claims under 42 U.S.C. § 1983 against Dr. Cosgrove, Former Chief Kalavsky, Chief Easthon, and Corporal Bailey, as well as Monell (*i.e.*, entity liability) claims against the CCF and CCPD. In light of the Court's foregoing rulings, however, these claims must fail. After all, it is axiomatic that there can be no Monell or supervisory liability if there is no underlying constitutional injury. See City of Canton v. Harris, 489 U.S. 378, 385 (1989). Thus, where, as here, the individual officers themselves committed no constitutional violation, liability will not extend to the officers' supervisor or employer.

F. Aaron's Monell and Supervisory Liability Claims

That leaves remaining Aaron's supervisory liability claims against Dr. Cosgrove, Former Chief Kalavsky, Chief Easthon, and Corporal Bailey as well as his Monell claims against the CCF and CCPD.

i. Entity Liability

A local government entity may be sued under § 1983 when "execution of [its] policy or custom...inflicts the [constitutional] injury...." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Failure to train can provide a basis for entity liability under § 1983 "only where the failure to train amounts to deliberate indifference to the rights of person with whom the police come into contact." City of Canton, 489 U.S. at 388. But where the policy of inadequate training is not itself unconstitutional, "considerably more proof than the single incident will be necessary in every case to establish...the requisite fault on the part of the" governmental body. Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985).

Here, Aaron points to several policies that, in his view, amount to inadequate training: "the failure to provide any diversity training to the Defendant Officers regarding relating [sic] to the large African American community that lives in and around the main campus of the Cleveland Clinic"; the "Electro-Muscular Disruption Technology (Taser)" policy; the "Use of Force" policy; and the "Traffic Safety Enforcement Policy". (Doc. # 30 at 26). Aaron does not allege that any of these policies are in themselves unconstitutional; rather, he alleges that they "were the moving force behind the" Defendant Officers' unconstitutional acts. (Id.). Yet, under Tuttle, that is not enough to state a claim of entity liability.

The same is true of a claim based on ratification. In order to succeed under such a theory, a plaintiff must show "(1) a clear and persistent pattern of illegal activity, (2) which the [entity] knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the...custom was the cause of the" underlying constitutional violation. Thomas v. City of Chattanooga, 398 F.3d 426, 433 (6th Cir. 2005). Aaron does not allege a pattern—let alone a clear and persistent pattern—of illegal activity. Moreover, as Defendants astutely observe, "an incomplete investigation *after* a constitutional violation has occurred cannot be the moving force behind an already-completed action." (Doc. # 34 at 13). See Black v. City of Memphis, No. 98-6508, 2000 WL 687683, at *3 (6th Cir. 2000) ("Black has failed to present any evidence to

indicate that the failure to investigate Officer Dolan's conduct after the shooting was the 'moving force' behind Norris's death."); see also Kies v. City of Lima, 612 F. Supp. 2d 888, 901 (N.D. Ohio 2009) ("Failure to discipline two officers regarding one alleged incident does not constitute 'implicit ratification' indicative of a general policy of deliberate indifference toward unconstitutional conduct."). Accordingly, Aaron's Monell claim fails.

      ii. Supervisory Liability

A supervisor may be liable pursuant to § 1983 for failing to train his officers if he "either encouraged the specific incident of misconduct or in some other way directly participated in it." Phillips v. Roane County, 534 F.3d 531, 543 (6th Cir. 2008) (internal quotation and citation omitted). General allegations that the officers were not properly trained "are more appropriately submitted as evidence to support a failure-to-train theory against the [entity]" rather than against the supervisors. Id. at 543–44.

Here, Plaintiff Aaron does not allege the supervisor Defendants were personally involved in the incidents that occurred on January 23, 2011, nor does he allege that they encouraged the misconduct. Accordingly, his supervisory liability claim fails.

III. Conclusion

For the reasons aforementioned, the Court grants Defendants' motion for judgment on the pleadings in its entirety and dismisses all the claims asserted by Plaintiffs Annie and Essex Hayward as well as Plaintiff Aaron Hayward's intentional-infliction-of-emotional-distress claim and his § 1983 claims against the CCF, the CCPD, Easthon, Kalavsky, Bailey, and Cosgrove.

**IT IS SO ORDERED.**

                           */s/ Dan A. Polster   July 11, 2012*
                           **Dan Aaron Polster**
                           **United States District Judge**